**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DAVID MATTESON, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>          v.<br><br>TRANSOCEAN LTD., JEREMY D. THIGPEN, MARK L. MEY, and THAD VAYDA,<br><br>                    Defendants. | Case No. 1:25-cv-01112<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br><u>Demand for Jury Trial</u> |

Plaintiff David Matteson ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Transocean Ltd. ("Transocean" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Transocean's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

1

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Transocean securities between May 1, 2023 and September 2, 2024, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.     Defendants provided investors with material information concerning which assets of Transocean's were non-strategic and the valuation of the Company's assets as a whole. Defendants statements included, among other things, insinuations that the *Discoverer Inspiration* and the *Development Driller III* were considered strategic assets, which, as a results, meant the Company's recorded asset valuations were overstated.

3.     Defendants provided these positive statements to investors while, at the same time, disseminating false and materially misleading statements and/or concealing material adverse facts concerning the true state of the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: the *Discoverer Inspiration* and the *Development Driller III* were considered non-strategic assets, the Company's recorded asset valuations were overstated, which, as a result, meant the Company would take nearly twice the vessels' sale price in impairment if sold. As a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

4.     Investors began to question the veracity of Defendants' public statements on September 3, 2024 when Transocean announced, while the market was closed, "as part of the Company's effort to dispose of non-strategic assets" the Company had agreed to sell the *Development Driller III* and *the Discoverer Inspiration* and associated other assets for an aggregate $342 million. The Company further announced that the sales would result in an estimated third-quarter non-cash charge of up to $645 million associated with the impairment of said assets. Therefore, the Company's

expected proceeds from the sale of the two aforementioned rigs was only approximately half the impairment the Company was required to take for the sale.

5.      Investors and analysts reacted immediately to Transocean's revelation. The price of Transocean's common stock declined dramatically. From a closing market price of $4.74 per share on August 30, 2024, Transocean's stock price fell to $4.32 per share on September 3, 2024, a decline of over 8%.

6.      This action seeks to recover the losses investors sustained as a result of Defendants' violations of the federal securities laws.

## JURISDICTION AND VENUE

7.      Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

8.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

10.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as a significant portion of Transocean's business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

11.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

12.     Plaintiff purchased Transocean common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Transocean is attached hereto.

13.     Transocean, Ltd. is Swiss corporation with its principal executive offices located Turmstrasse 30, Steinhausen, Switzerland. During the Class Period, the Company's common stock traded on the New York Stock Exchange (the "NYSE") under the symbol "RIG."

14.     Defendant Jeremy D. Thigpen ("Thigpen") was, at all relevant times, the Company's Chief Executive Officer.

15.     Defendant Mark L. Mey ("Mey") was the Company's Chief Financial Officer from May 2015 until May 20, 2024.

16.     Defendant Thad Vayda ("Vayda") was the Company's Chief Financial Officer from May 20, 2024 onwards.

17.     Defendants Thigpen, Mey, and Vayda are sometimes referred to herein as the "Individual Defendants." Transocean together with the Individual Defendants are referred to herein as the "Defendants."

18.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Transocean's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual

4

Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

19.    Transocean is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

20.    The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Transocean under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

21.    Transocean, together with its subsidiaries, provides offshore contract drilling services for oil and gas wells worldwide. Transocean currently owns or operates a fleet of 34 mobile offshore drilling units, consisting of 26 ultra-deepwater floating rigs and eight harsh environment floating rigs. The Company's rigs are categorized as under contract, "idle," or "stacked."

22.    According to Transocean, an "idle" rig is one being held between contracts and readily available for operations. A "stacked" rig, however, is minimally manned or unmanned and typically is expected to continue to be inactive for an extended period. The Company provides monthly fleet updates as to the status of its ships. As of October 18, 2023, the Company had 13 stacked or idle rigs. Of those 13, two were marked idle: the *Discoverer Inspiration* (as of April 2023) and the *Development Driller III* (as of August 2023).

***The Defendants Materially Misled Investors Concerning the***

***Company's Rig Assets***

*May 1, 2023*

23.     On May 1, 2023, Transocean published its first quarter 2023 financial results in a press release for the period ended March 31, 2023. The press release reported the Company's first quarter 2023 adjusted net loss of $275 million. Defendant Thigpen stated, in relevant part:

> The Transocean team delivered an outstanding quarter of safe, reliable and efficient operations, with an adjusted EBITDA margin of 33% on adjusted revenues of $667 million. The strong performance is the result of excellent revenue efficiency of nearly 98 percent and exemplifies our commitment to operational excellence.
>
> ***Additionally, the contracts we secured during the quarter, which were predominantly for our harsh environment fleet, complement the wave of ultra-deepwater fixtures we announced over the last several quarters, providing further evidence of a broad, sustained upcycle.***
>
> [Emphasis added].

*October 31, 2023*

24.     On October 31, 2023, Transocean published its third quarter 2023 financial results in a press release for the period ended September 30, 2023. The press release reported the Company's third quarter 2023 adjusted net loss of $280 million. Defendant Thigpen stated, in pertinent part:

> For the sixth consecutive quarter Transocean increased its backlog, ending the third quarter at $9.4 billion dollars. Not only is the size of our backlog industry-leading, but it also contains many of the industry's highest dayrate fixtures. In particular, we are pleased to have secured a three-year contract for *Deepwater Aquila* in Brazil, as it facilitated the acquisition of the outstanding interest in Liquila Ventures Ltd. The addition of the *Aquila* further reinforces Transocean's leadership position in the high-specification, ultra-deepwater drilling market, as she is our eighth 1400 short ton, dual activity, seventh generation drillship, of which, there are only 12 in the global competitive fleet.
>
> ***Based on our ongoing conversations with customers, we firmly believe that we remain in the early stages of a multi-year upcycle. With our fleet of the most capable high-specification ultra-deepwater drillships and harsh environment semisubmersibles, Transocean is uniquely positioned to capitalize on current and future opportunities.***

[Emphasis added].

25.    Also on October 31, 2023, Transocean submitted its quarterly report for the fiscal period ended September 30, 2023 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. Specifically, the quarterly report stated, in relevant part:

> **Fair value measurements—*We estimate fair value at an exchange price that would be received to sell an asset or paid to transfer a liability in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants.*** Our valuation techniques require inputs that we categorize using a three-level hierarchy, from highest to lowest level of observable inputs, as follows: (1) significant observable inputs, including unadjusted quoted prices for identical assets or liabilities in active markets ("Level 1"), (2) significant other observable inputs, including direct or indirect market data for similar assets or liabilities in active markets or identical assets or liabilities in less active markets ("Level 2") and (3) significant unobservable inputs, including those that require considerable judgment for which there is little or no market data ("Level 3"). When a valuation requires multiple input levels, we categorize the entire fair value measurement according to the lowest level of input that is significant to the measurement even though we may have also utilized significant inputs that are more readily observable.

> *        *        *

> Our customers continue to pursue offshore projects in ***deepwater and harsh environments where rates of return and production volumes are anticipated to be very attractive,*** which is reflected in the resumption of postponed projects, commencement of new drilling and exploration campaigns and extensions of current drilling campaigns. ***Offshore drilling activity remains robust in every major ultra-deepwater geographic sector.***

> *        *        *

> ***As we project that this increased demand for both our asset groups will be sustained in the coming years,*** and as there are now fewer high-specification ***offshore drilling rigs capable of operating in these markets,*** we believe this demand may prompt the reactivation of cold stacked rigs and the delivery of remaining stranded newbuild assets.

> [Emphasis added].

*February 20, 2024*

26.     On February 20, 2024, Transocean published a press release detailing the Company's fourth quarter and full year 2023 fiscal results for the year ended December 31, 2024. The press release stated, in relevant part:

| | December 31, | |
| | 2023 | 2022 |
|---|---|---|
| **Assets** | | |
| Cash and cash equivalents | $    762 | $    683 |
| Accounts receivable, net | 512 | 485 |
| Materials and supplies, net | 426 | 388 |
| Restricted cash and cash equivalents | 233 | 308 |
| Other current assets | 193 | 144 |
| Total current assets | 2,126 | 2,008 |
| | | |
| Property and equipment | 23,875 | 24,217 |
| Less accumulated depreciation | (6,934) | (6,748) |
| Property and equipment, net | 16,941 | 17,469 |
| Contract intangible assets | 4 | 56 |
| Deferred tax assets, net | 44 | 13 |
| Other assets | 1,139 | 890 |
| Total assets | $20,254 | $20,436 |

27.     Also on February 20, 2024, Transocean submitted its annual report for the fiscal year ended December 31, 2024 on a Form 10-K filed with the SEC, affirming the previously reported financial results (the "2023 10-K"). The 2023 10-K described the Company's purported fair value measurements and the valuation of the Company's property and equipment, stating in relevant part:

**Fair value measurements—*We estimate fair value at an exchange price that would be received to sell an asset or paid to transfer a liability in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants.*** Our valuation techniques require inputs that we categorize using a three-level hierarchy, from highest to lowest level of observable inputs, as follows: (1) significant observable inputs, including unadjusted quoted prices for identical assets or liabilities in active markets ("Level 1"), (2) significant other observable inputs, including direct or indirect market data for similar assets or liabilities in active markets or identical assets or liabilities in less active markets ("Level 2") and (3) significant unobservable inputs, including those that require considerable judgment for which there is little or no market data ("Level 3"). When a valuation requires multiple input levels, we categorize the entire fair value measurement according to the lowest level of input that is significant to the

measurement even though we may have also utilized significant inputs that are more readily observable.

*        *        *

At December 31, 2023, the aggregate carrying amount of our property and equipment represented approximately 84 percent of our total assets.

*        *        *

**Impairments**—In the years ended December 31, 2023 and 2021, we recognized a loss of $5 million and $37 million, respectively, which had no tax effect, recorded in other, net, associated with the impairment of certain equity investments upon determination that the carrying amount exceeded the estimated fair value and that the impairment was other than temporary. ***For the impairment in the year ended December 31, 2021, we estimated the fair value of our investment by applying the income method using significant unobservable inputs, representative of Level 3 fair value measurements, including an assumed discount rate of 12 percent and assumptions about the future performance of the investment, such as future demand and supply for harsh environment floaters, rig utilization, revenue efficiency and dayrates.***

*        *        *

**Our drilling contracts may be terminated due to a number of events, and, during depressed market conditions, our customers may seek to repudiate or renegotiate their contracts.**

Certain of our drilling contracts with customers may be cancelable at the option of the customer upon payment of an early termination payment. ***In the third quarter of 2023, as the most recent example, Development Driller III concluded the activities contemplated in its drilling contract prior to the end of the contract's firm term that was previously expected early in the fourth quarter of 2023.*** The termination payment associated with the drilling contract would not fully compensate us for the early termination of the contract. Drilling contracts also customarily provide for either automatic termination or termination at the option of the customer, typically without the payment of any termination fee, under various circumstances such as non-performance, as a result of significant downtime or impaired performance caused by equipment or operational issues, or sustained periods of downtime due to force majeure events, many of which are beyond our control.

[Emphasis added].

<u>*April 17, 2024*</u>

28.    On April 17, 2024, Transocean published a report entitled "Transocean Fleet Status Report," which included information about drilling rig status and contracts. The report listed

9

the *Discoverer Inspiration* and the *Development Driller III* as "Idle." The report further defined "Idle"

as "between contracts, readily available for operations." Specifically, the report stated, in relevant

part:

> ***An "Idle" rig is primarily between contracts, readily available for operations, and operating costs are typically at or near normal levels.*** A "Stacked" rig, on the other hand, is primarily manned by a reduced crew or unmanned and typically has reduced operating costs and is (i) preparing for an extended period of inactivity, (ii) expected to continue to be inactive for an extended period, or (iii) completing a period of extended inactivity. However, stacked rigs will continue to incur operating costs at or above normal operating costs for approximately 30 days following initiation of stacking.
>
> [Emphasis added].

<u>*April 29, 2024*</u>

29.    On April 29, 2024, after the market closed, Transocean published its first quarter 2024

financial results in a press release for the period ended March 31, 2024. The press release reported

the Company's first quarter 2024 adjusted net loss of $22 million. Defendant Thigpen stated, in

relevant part:

> Over the first months of 2024, Transocean has achieved some fairly significant milestones. First, we secured a 365-day extension on Deepwater Asgard at a rate of $505,000 per day, once again demonstrating the sustained tightness in the high-specification floater market as well as Transocean's ability to command industry-leading dayrates. Additionally, earlier this month we finalized a $1.8 billion debt refinancing transaction, enabling us to improve near-term liquidity and start the process of simplifying our balance sheet. We also completed the extension of our revolving credit facility to mid-2028, further enhancing our financial flexibility.
>
> Looking ahead, we remain encouraged by the demand outlook and expect to see numerous long-term contracts awarded over the next several months. As we work to secure those contracts, we will remain acutely focused on operational execution across our fleet, as we endeavor to maximize the conversion of our industry-leading backlog to cash.

30.    The press release also reported Transocean's purported assets for the quarter, in

pertinent part:

| | March 31, 2024 | | December 31, 2023 |
|---|---|---|---|
| **Assets** | | | |
| Cash and cash equivalents | $ | 446 | $ 762 |
| Accounts receivable, net of allowance of $2 at March 31, 2024 and December 31, 2023 | | 585 | 512 |
| Materials and supplies, net of allowance of $202 and $198 at March 31, 2024 and December 31, 2023, respectively | | 437 | 426 |
| Restricted cash and cash equivalents | | 270 | 233 |
| Other current assets | | 133 | 193 |
| Total current assets | | 1,871 | 2,126 |
| | | | |
| Property and equipment | | 23,948 | 23,875 |
| Less accumulated depreciation | | (7,093) | (6,934) |
| Property and equipment, net | | 16,855 | 16,941 |
| Contract intangible assets | | — | 4 |
| Deferred tax assets, net | | 45 | 44 |
| Other assets | | 1,166 | 1,139 |
| Total assets | $ | 19,937 | $ 20,254 |

*April 30, 2024*

31.    On April 30, 2024, Transocean published its quarterly report for the period ended March 31, 2024 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The report stated, in relevant part:

**Fair value measurements—*We estimate fair value at an exchange price that would be received to sell an asset or paid to transfer a liability in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants.*** Our valuation techniques require inputs that we categorize using a three-level hierarchy, from highest to lowest level of observable inputs, as follows: (1) significant observable inputs, including unadjusted quoted prices for identical assets or liabilities in active markets ("Level 1"), (2) significant other observable inputs, including direct or indirect market data for similar assets or liabilities in active markets or identical assets or liabilities in less active markets ("Level 2") and (3) significant unobservable inputs, including those that require considerable judgment for which there is little or no market data ("Level 3").  When a valuation requires multiple input levels, we categorize the entire fair value measurement according to the lowest level of input that is significant to the measurement even though we may have also utilized significant inputs that are more readily observable.

*         *         *

Our customers continue to pursue offshore projects in ***deepwater and harsh environments where rates of return and production volumes are anticipated to be very attractive,*** which is reflected in the resumption of postponed projects,

commencement of new drilling and exploration campaigns and extensions of current drilling campaigns. ***Offshore drilling activity remains robust in every major ultra-deepwater geographic sector.***

*     *     *

***As we project that this increased demand for both our asset groups will be sustained in the coming years,*** and as there are now fewer high-specification ***offshore drilling rigs capable of operating in these markets,*** we believe this demand may prompt the reactivation of cold stacked rigs and the delivery of remaining stranded newbuild assets.

[Emphasis added].

## *July 31, 2024*

32.     On July 31, 2024, Transocean published its second quarter 2024 financial results in a press release for the period ended June 30, 2024. The press release reported the Company's second quarter 2023 adjusted net loss of $123 million. Defendant Thigpen stated, in relevant part:

The entire Transocean team executed well in the second quarter, delivering strong uptime performance for our customers, which drove revenue efficiency to 97% and produced 33% Adjusted EBITDA margins. In addition, the team recently secured a number of meaningful contracts, which are illustrative of current industry dynamics and reinforce our view that we are in an increasingly tightening market. Of these contracts, we are especially excited to continue 20K operations with Beacon in the U.S. Gulf of Mexico.

As we continue to secure work for our fleet, our focus remains on optimizing our portfolio of assets to maximize EBITDA and generate free cash flows, which we can use to de-lever the balance sheet.

33.     The press release also included the Company's purported assets, in pertinent part:

| | June 30, 2024 | December 31, 2023 |
|---|---|---|
| **Assets** | | |
| Cash and cash equivalents | $ 475 | $ 762 |
| Accounts receivable, net of allowance of $2 at June 30, 2024 and December 31, 2023 | 607 | 512 |
| Materials and supplies, net of allowance of $197 and $198 at June 30, 2024 and December 31, 2023, respectively | 440 | 426 |
| Restricted cash and cash equivalents | 400 | 233 |
| Other current assets | 213 | 193 |
| Total current assets | 2,135 | 2,126 |
| | | |
| Property and equipment | 24,066 | 23,875 |
| Less accumulated depreciation | (6,983) | (6,934) |
| Property and equipment, net | 17,083 | 16,941 |
| Contract intangible assets | — | 4 |
| Deferred tax assets, net | 30 | 44 |
| Other assets | 1,077 | 1,139 |
| Total assets | $ 20,325 | $ 20,254 |

### *August 1, 2024*

34.     On August 1, 2024, Transocean published its quarterly report for the period ended June 30, 2024 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The report stated, in relevant part:

> **Fair value measurements—*We estimate fair value at an exchange price that would be received to sell an asset or paid to transfer a liability in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants.*** Our valuation techniques require inputs that we categorize using a three-level hierarchy, from highest to lowest level of observable inputs, as follows: (1) significant observable inputs, including unadjusted quoted prices for identical assets or liabilities in active markets ("Level 1"), (2) significant other observable inputs, including direct or indirect market data for similar assets or liabilities in active markets or identical assets or liabilities in less active markets ("Level 2") and (3) significant unobservable inputs, including those that require considerable judgment for which there is little or no market data ("Level 3"). When a valuation requires multiple input levels, we categorize the entire fair value measurement according to the lowest level of input that is significant to the measurement even though we may have also utilized significant inputs that are more readily observable.
>
> *       *       *
>
> Our customers continue to pursue offshore projects in ***deepwater and harsh environments where rates of return and production volumes are anticipated to be very attractive,*** which is reflected in the resumption of postponed projects, commencement of new drilling and exploration campaigns and extensions of current drilling campaigns. ***Offshore drilling activity remains robust in every major ultra-deepwater geographic sector.***

        *     *     *

> ***As we project that this increased demand for both our asset groups will be sustained in the coming years,*** and as there are now fewer high-specification ***offshore drilling rigs capable of operating in these markets,*** we believe this demand may prompt the reactivation of cold stacked rigs and the delivery of remaining stranded newbuild assets.

[Emphasis added].

35.     Also on August 1, 2024, Transocean hosted an earnings call, wherein Defendant Thigpen responded to a question regarding the outlook of *Development Driller III* and the *Inspiration* specifically. Defendant Thigpen responded, in pertinent part:

> **I think, as we said before, we're basically going to only put them** [the *Development Driller III* and the *Inspiration*] **on the right opportunities, but we're not going to try and compete with them for short-term mark. *So we're basically keeping them drive for longer opportunities*.**

[Emphasis added].

36.     The above statements in Paragraphs 23 to 35 were false and/or materially misleading by concealing and misrepresenting the true state of Transocean's assets, specifically the Company's rig asset classifications. In truth, the *Discoverer Inspiration* and the *Development Driller III* were considered non-strategic assets by Transocean, the Company's recorded asset valuations were overstated, and, as a result, the Company would take nearly twice the vessels' sale price in impairment if sold. Furthermore, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

14

*The Truth Emerges*

37.    On September 3, 2024, before the market opened, Transocean published a press release announcing the Company's decision to dispose of non-strategic assets. In particular, Transocean had agreed to sell the *Development Driller III* and the *Discoverer Inspiration* and associated assets for an aggregate $342 million. The press release stated, in pertinent part:

> *On September 3, 2024, as part of our ongoing efforts to dispose of non-strategic assets, Transocean Ltd. (the "Company") announced that a subsidiary of the Company entered into agreements (the "agreements") with a third party to sell the Development Driller III and associated assets for $195 million and the Discoverer Inspiration and associated assets for $147 million. The Company expects the sale of these assets, for an aggregate $342 million, will result in an estimated non-cash charge for the third quarter 2024 ranging between $630 million and $645 million associated with the impairment of such assets.*

> The transactions contemplated by the agreements are subject to customary closing conditions and are expected to close in the third quarter of 2024. The Company intends to use substantially all of the proceeds from these transactions to repay existing indebtedness.

> [Emphasis added].

38.    Investors and analysts reacted immediately to Transocean's revelation. The price of Transocean's common stock declined dramatically. From a closing market price of $4.74 per share on August 30, 2024, Transocean's stock price fell to $4.32 per share on September 3, 2024, a decline of over 8%.

*Loss Causation and Economic Loss*

39.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Transocean's common stock and operated as a fraud or deceit on Class Period purchasers of Transocean's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Transocean's common stock materially declined, as the prior artificial inflation came out

of the price over time. As a result of their purchases of Transocean's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages under federal securities laws.

### *Presumption of Reliance; Fraud-On-The-Market*

40.    At all relevant times, the market for Transocean's common stock was an efficient market for the following reasons, among others:

(a)    Transocean's common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

(b)    Transocean communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)    Transocean was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)    Unexpected material news about Transocean was reflected in and incorporated into the Company's stock price during the Class Period.

41.     As a result of the foregoing, the market for Transocean common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Transocean's stock price. Under these circumstances, all purchasers of Transocean's common stock during the Class Period suffered similar injury through their purchase of Transocean's common stock at artificially inflated prices, and a presumption of reliance applies.

42.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### *No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine*

43.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with material information concerning the Company's rigs and other financial assets. These statements were not forward-looking and/or omitted material information about existing events and circumstances.

44.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that

could cause actual results to differ materially from those in the purportedly forward-looking statements.

45.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Transocean who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

46.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Transocean's common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

47.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Transocean's common stock were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can

be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Transocean or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of October 24, 2024, there were 875.88 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

48.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

49.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

50.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Transocean;

(c)     whether the Individual Defendants caused Transocean to issue false and misleading financial statements during the Class Period;

(d)     whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)     whether the prices of Transocean's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

51.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*

### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

52.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

53.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

54.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions,

practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Transocean common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Transocean's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

55.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Transocean's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

56.    By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants

were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

57.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Transocean's internal affairs.

58.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Transocean's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Transocean's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Transocean's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

59.    During the Class Period, Transocean's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be

disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Transocean's common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Transocean's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Transocean's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

60.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

61.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*

### *for Violations of Section 20(a) of the Exchange Act*

62.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

63. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Transocean's misstatements.

64. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Transocean which had become materially false or misleading.

65. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Transocean disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Transocean to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Transocean's common stock.

66. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Transocean to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

67.    By reason of the above conduct, the Individual Defendants and/or Transocean are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.


Dated: February 7, 2025                              Respectfully submitted,

                                                    **LEVI & KORSINSKY, LLP**


                                                    _/s/ Adam M. Apton_
                                                    Adam M. Apton
                                                    33 Whitehall Street, 17th Floor
                                                    New York, New York 10004
                                                    Tel.: (212) 363-7500
                                                    Fax: (212) 363-7171
                                                    Email: aapton@zlk.com

                                                    *Attorneys for Plaintiff*